<u>NOT FOR PUBLICATION</u>                                    <u>CLOSED</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| : | |
| : | |
| : | Honorable Faith S. Hochberg |
| LAURIE A. BATTIATO-MUSSON, : | |
| : | Civil Action No. 08-3531 |
| Plaintiff, : | |
| : | |
| v. : | **OPINION & ORDER** |
| : | |
| COMMISSIONER OF SOCIAL SECURITY, : | Dated: July 23, 2009 |
| : | |
| Defendant. : | |
| : | |
| : | |

<u>**HOCHBERG, District Judge:**</u>

This matter comes before the Court upon Plaintiff's motion to review a final

determination of the Commissioner of Social Security ("Commissioner") pursuant to the Social

Security Act, as amended, 42 U.S.C. § 405(g).  The motion has been decided upon the written

submission of the parties pursuant to Federal Rule of Civil Procedure 78.

## I. BACKGROUND

**A.      Plaintiff's Medical History**

Plaintiff is a 47-year-old woman, with an Associate's degree.[1]  (Tr. 332.)  Plaintiff

indicates that she was working as an administrative aide from March 1986 until March 31, 2001,

---

[1] Plaintiff accumulated 87 college credits.  (Tr. 333.)  This is the equivalent of three years of college, which she completed in approximately May of 1998.  (Tr. 64.)  She also completed a special program in secretarial studies in 1983.  (Tr. 64.)

when she stopped working to take care of her children.[2]  (Tr. 59.)  She filed for disability on November 3, 2004, alleging that she became disabled on September 19, 2004 due to her previous myocardial infarction,[3] triple vessel coronary disease, severe depression, gastritis, and pains in her neck and left shoulder.  (Tr. 58.)  Plaintiff was also diagnosed with hyperthyroidism (Grave's disease)[4] in 2006.  (Tr. 19.)

From September 19-23, 2004, Plaintiff was admitted into Overlook Hospital with a diagnosis of inferior wall myocardial infarction, which did not require surgery or stenting.  (Tr. 19, 117.)  Plaintiff was also diagnosed with low HDL,[5] tobacco abuse,[6] and gastroesophageal reflux disease.[7]  (Tr. 117.)  She was treated with the following discharge medications: Aspirin, Plavix, Altace, Toprol-XL, Lipitor and Prevacid.  (Tr. 117.)

---

[2] At Plaintiff's job, she filed bids and contracts, answered phones, created spreadsheets and graphics presentations, made photocopies, wrote letters and memos, arranged for her supervisors' travel, and kept their calendars.  (Tr. 59.)  At the first ALJ hearing in 2007, Plaintiff testified that she also stopped working to take care of her sister's children (since her sister had passed away).  (Tr. 335.)

[3] A myocardial infarction is popularly called a heart attack.  "Myocardial infarction (MI)." *Dorland's Medical Dictionary for Healthcare Consumers,* www.mercksource.com (2007) [hereinafter *Dorland's Medical Dictionary for Healthcare Consumers*].

[4] Hyperthyroidism is the excessive functional activity of the thyroid gland, and it is commonly part of Grave's disease.  "Hyperthyroidism." *Dorland's Medical Dictionary for Healthcare Consumers*.

[5] HDL, or high-density lipoproteins, are lipoproteins that are synthesized by the liver and promote transport of cholesterol to the liver for excretion in the bile; high levels of cholesterol in the blood means an increased risk of ischemic heart disease.  "High-density lipoprotein (HDL)." *Dorland's Medical Dictionary for Healthcare Consumers*.

[6] On September 20, 2004, Dr. Barry Cohen, M.D., Plaintiff's treating cardiologist, described Plaintiff as a "heavy smoker."  (Tr. 113.)  She continued to smoke on and off throughout 2005, 2006 and 2007.  (Tr. 188, 223, 225, 227, 228, 235, 306, 308.)

[7] Gastroesophageal reflux disease, or GERD, is any of the serious conditions resulting from the reflux of the stomach contents into the esophagus.  "Gastroesophageal reflux disease (GERD)," "Esophageal reflux." *Dorland's Medical Dictionary for Healthcare Consumers.*

From 2004 to 2007, Plaintiff visited Dr. Barry Cohen, M.D. several times to follow-up in regards to her myocardial infarction.  On October 4, 2004, Dr. Cohen reported that Plaintiff had triple-vessel coronary disease.  (Tr. 197.)  Dr. Cohen also consistently reported that Plaintiff did not have angina.[8]  (Tr. 188, 191, 193, 195, 223, 225.)  On May 11, 2005, Dr. Cohen stated that Plaintiff had "significant cardiovascular disease and a prior heart attack.  She is disabled from full function related to this event."  (Tr. 190.)  However, on August 17, 2005, Dr. Cohen reported that Plaintiff went water-skiing and had a "great time."  (Tr. 235.)  On November 14, 2005, Plaintiff took treadmill stress and nuclear tests; after exercising on the treadmill for 11.25 minutes, Plaintiff was able to achieve an estimated workload of 13.40 METS[9] and her heart rate was 82% of the age-predicted maximal heart rate.  (Tr. 234.)  On November 12, 2007, Dr. Cohen reported that Plaintiff did not have typical anginal chest pain, "although shortness of breath on exertion may represent an anginal equivalent."  (Tr. 306.)

On February 17, 2005, Dr. William Lathan, M.D. conducted a consultative physical examination of Plaintiff, and determined that Plaintiff had a "severe restriction for activities regarding strenuous exertion."  (Tr. 23, 218.)

On March 28, 2005, Dr. W. Wells, M.D., a state agency medical consultant, reviewed Plaintiff's medical evidence, and reported that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, and stand and/or walk with normal breaks

---

[8] On December 15, 2004 and January 26, 2005, Plaintiff complained of atypical chest or arm pain, but Dr. Cohen reported that it did not appear anginal.  (Tr. 195, 202.)  Angina is now used almost exclusively to denote angina pectoris, ("Angina." *Dorland's Medical Dictionary for Healthcare Consumers*), which is acute pain in the chest resulting from not enough blood reaching the heart muscle. "Angina pectoris." *Dorland's Medical Dictionary for Healthcare Consumers.*

[9] Upon review, Social Security consultant Dr. Fechner described this as "quite good."  (Tr. 380.)

3

for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight hour workday, and had the unlimited ability to push and/or pull.  (Tr. 206.)  Additionally, Dr. Wells found that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that she had no manipulative, visual, or communicative limitations, and that her only two environmental limitations were to avoid all exposure to extreme cold and extreme heat.  (Tr. 206-208.)

In 2007, Plaintiff visited Dr. Jeffrey Bauman, M.D. for her Graves Disease, and subsequent hypothyroidism.  (Tr. 308-317.)  On May 1, 2007, Dr. Bauman reported that Plaintiff's thyroid scan was consistent with mild Graves disease.  (Tr. 315.)  On September 24, 2007, Plaintiff complained of feeling "lousy," and Dr. Bauman prescribed thyroid hormones.  (Tr. 309.)  On November 1, 2007, Plaintiff reported that she felt better, although she still had some headaches.  (Tr. 308.)  Dr. Bauman reported that Plaintiff still had some symptoms, but her TSH[10] was within the normal range.  (Tr. 308.)

At both hearings, Plaintiff complained of insomnia, which she said began right after her heart attack in 2004, (Tr. 337.), and which she described as ongoing.  (Tr. 337, 368-369.)  In June 2005, Plaintiff reported that she was taking medication for her insomnia, as well as her depression and her heart.  (Tr. 76.)  Additionally, she reported fatigue due to her medications.  (Tr. 76.)  At the January 2008 hearing, Plaintiff testified that she took Tylenol for her headaches.  (Tr. 371.)

---

[10] TSH, or thyroid-stimulating hormone test, is a type of thyroid function test in which the thyroid gland is monitored over time for a response or areas of decreased responsiveness.  "Thyroid-stimulating hormone test." *Dorland's Medical Dictionary for Healthcare Consumers.*

**B.     Plaintiff's Mental Health History**

On December 21, 2004, Plaintiff saw Kathleen Kobberger, R.N., M.S., C.S.[11]  (Tr. 161.)

Nurse Specialist Kobberger reported that Plaintiff's symptoms had been improving with the

cognitive behavioral therapy, but that she "tends to relapse when issues related to the divorce

surface." (Tr. 162.)  She also reported that while Plaintiff had no limitations in her

understanding and memory, social interaction, and adaption-related mental activities, she had

limited ability in sustained concentration and persistence.  (Tr. 165-166.)  Furthermore, she

reported that "the strain on her [Plaintiff's] health, (i.e. cardiac status & depression & feeling

overwhelmed) would make her participation in the work world impossible at this time." (Tr.

164.)

On February 3, 2005, state psychiatric consultant Dr. Janice Drucker, M.D. conducted a

psychiatric review of Plaintiff.  (Tr. 169.)  Dr. Drucker found that, when rated under the Social

Security regulations, Listing 12.04 (affective disorders),[12] Plaintiff had mild restriction of

activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties

in maintaining concentration, persistence or pace, and no repeated episodes of deterioration.  (Tr.

179.)  Dr. Drucker reported that Plaintiff was "able to understand, remember, carry out

instructions, sustain attention/concentration, relate to coworkers/supervisors, adapt to changes in

---

[11] Plaintiff first visited Nurse Specialist Kobberger in April 2003 when she discovered that her husband was having an affair.  At that time, Nurse Specialist Kobberger described Plaintiff's mood as "marked depressed and anxious."  (Tr. 162.)

[12] If the plaintiff has a severe impairment, and the impairment meets or equals an impairment listed on the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, then she is found disabled.  20 C.F.R. § 404.1520(d).

5

work environment." (Tr. 185.)

On May 4, 2005, Dr. Jan S. Cavanaugh, Ph.D. conducted a consultative psychiatric examination, and found that Plaintiff's prognosis was "fair," and that vocationally, Plaintiff appeared "to be capable of understanding and following simple instructions and directions...performing simple and complex tasks with supervision and function independently...maintaining attention and concentration for tasks." (Tr. 213-214.) Dr. Cavanaugh also reported that Plaintiff was able to "regularly attend to a routine and maintain a schedule," and that she appeared to be able to learn "new tasks...to relate to and interact appropriately with others. She appears to be limited in dealing with the stress of her failed marriage, and problematic health." (Tr. 213-214.)

On January 6, 2007, Nurse Specialist Kathleen Kobberger filled out a Mental Impairment Questionnaire about Plaintiff's therapy, as well as her progress and limitations. (Tr. 250.) Nurse Specialist Kobberger reported that, with cognitive behavioral therapy, Plaintiff "is motivated in treatment and has made progress but continues to struggle with managing the stresses of her life" and that her depression "is in partial remission with mild symptoms." (Tr. 251-252.) She also reported that Plaintiff's current GAF[13] was 69, and her highest GAF in 2006 was 75. (Tr. 250.) Nurse Specialist Kobberger reported that Plaintiff had unlimited or very good mental ability to

---

[13] GAF, or Global Assessment of Functioning, is a rating of overall psychological functioning on a scale of 0 to 100. A rating of 61 to 70 means that the individual has some mild symptoms (such as depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but has the ability to generally function well, and has some meaningful interpersonal relationships. A rating of 71 to 80 means that if the individual has symptoms, they are transient and expected reactions to psychosocial stressors (such as having difficulty concentrating after a family argument), and the individual has no more than slight impairments in social, occupational, or school functioning. (D. Br. 11-12 (citing Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R) 34 (4th ed., text revision, 2000)).)

"understand and remember very short and simple instructions;" unlimited or very good mental ability to "make simple work-related decisions;" and unlimited or very good mental ability to "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;" with poor or no ability to "maintain regular attendance and be punctual within customary, usually strict tolerances;" poor or no ability to "perform at a consistent pace without an unreasonable number and length of rest periods;" and poor or no ability to "deal with normal work stress." (Tr. 254-256.)

Nurse Specialist Kobberger also created a summary of Plaintiff's treatment from January 18, 2007 to December 5, 2007. (Tr. 320-321.) She stated that Plaintiff is "a responsible, competent person but finds she is easily distracted and unable to concentrate;" that Plaintiff's "struggle with fluctuating degrees of anxiety and depression continue;" but also that her "irritability/anger are still expressed but she has been better able to manage these feelings especially in terms of dealing with her ex-husband." (Tr. 320.) Finally, Nurse Specialist Kobberger stated that she was still "significantly concerned about the impact of entering the work environment on the already struggling woman." (Tr. 321.)

## C.    Medical Expert's Testimony

At the second ALJ hearing, Dr. Martin Fechner reviewed Plaintiff's medical files, heard her testimony, and then testified himself. (Tr. 379.) Based on his review of the medical file, Dr. Fechner identified that Plaintiff had a cardiological problem, but said that she had "a heart attack from basically normal vessels that go into kind of a spasm...so she does not have any obstruction

in her coronary arteries as of November of '05." (Tr. 379-380.)[14]  Next, Dr. Fechner commented

on Plaintiff's Graves disease (hyperthyroidism).  (Tr. 381.)  Dr. Fechner noted that Plaintiff's

TSH was normal on November 30, 2007, (according to Dr. Cohen), which he said indicated that

the medication she was taking to replace the hormone from the thyroid gland "is replacing very

nicely at this point."  (Tr. 381.)  Dr. Fechner stated that those were Plaintiff's two medical

conditions (he said that he would not discuss her psychiatric problem).  (Tr. 379, 381.)

Furthermore, he said that Plaintiff's impairments, whether considered individually or in

combination, do not meet or equal any Listing.  (Tr. 382.)  When asked by the ALJ if he thought

that Plaintiff's impairments would affect her ability to work, Dr. Fechner said that he would

"restrict her to light activity.  I think she could do a full range of light activity, lifting 20 pounds

occasionally, ten pounds frequently.  I think she could walk or stand an aggregate of six hours in

an eight hour day."[15]  (Tr. 382.)

## D.   Vocational Expert's Testimony

At the second ALJ hearing, Vocational Expert Melissa Fass-Karlin reviewed Plaintiff's

medical files, heard her testimony, and then testified herself.  (Tr. 382-383.)  Vocational Expert

Fass-Karlin testified that Plaintiff could not return to her previous job as an administrative

assistant, because that job was skilled and Plaintiff now had a restriction of "simple, unskilled

work."[16]  (Tr. 383-384.)  However, she also testified that, based on the hypothetical posed by the

---

[14] When the ALJ asked Dr. Fechner if he knew what would cause the spasm, the doctor responded that "Nobody knows...It's just one of those things that happened."  (Tr. 381.)

[15] Both Dr. Fechner and the ALJ noted that Dr. Fechner's opinion was "without any consideration of the psychological overlay that might happen...in terms of functioning." (Tr. 382.)

[16] The ALJ posed a hypothetical of a person who could do light work, but who was "limited to jobs that require only occasional use of ladders, ropes, ramps or stairs.  Jobs that require only occasional

ALJ of a person who could do light work, this person could work as an assembler of small parts (SVP of 2),[17] a machine tender (SVP of 2), or a marker (SVP of 2), each of which exists in both the local and national economies.  (Tr. 384-385.)  Next, the ALJ asked Fass-Karlin to take into account the same hypothetical as previously posed, but to also assume that the hypothetical person could only focus for about one-third of the workday (two hours), due to fatigue, anxiety, and depression.  (Tr. 385.)  The ALJ then asked Fass-Karlin if an individual who, given the scheduling and other problems as described by the Plaintiff, had to miss one day of work/week, would be able to still work.  (Tr. 386.)  Fass-Karlin said that both of these issues would be too excessive for the jobs that she posed.  (Tr. 385-386.)

**E.    Procedural History**

On November 3, 2004, Plaintiff filed an application for Supplemental Security Income benefits, (Tr. 29-30), alleging an inability to work since September 19, 2004 (Tr. 55) due to acute myocardial infarction and affective disorder.  (Tr. 29.)  This application was denied initially (Tr. 31-34), and on reconsideration.  (Tr. 39-41.)  Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 43.)  The hearing convened on January 12, 2007 before ALJ Donna Krappa; Plaintiff, with her representative, appeared and testified at the hearing.  (Tr. 324.)  In a decision dated April 19, 2007, the ALJ found that Plaintiff was not disabled and was thus not entitled to benefits.  (Tr. 262-272.)  Plaintiff requested a review of the ALJ's hearing

---

stooping, kneeling, crouching or crawling.  Jobs that are low – that are simple and unskilled involving one or two step tasks that are low stress...these jobs require only an occasional change in the work setting during the day and only an occasional change in decision-making required during the day.  And that require only occasional contact with supervisors, co-workers and the general public.  And jobs that would permit her to have three breaks during the workday."  (Tr. 383-384.)

[17] Specific vocational preparation, or SVP, is listed by the Dictionary of Occupational Titles for each described occupation.  An SVP of 1-2 is unskilled work.  Social Security Ruling (SSR) 00-4p.

decision on June 7, 2007.  (Tr. 278.)  The Appeals Council granted Plaintiff's request for review,

vacated the ALJ's hearing decision, and remanded the case.  (Tr. 274-277.)  The second hearing

convened on January 29, 2008 before ALJ Donna Krappa; Plaintiff, with her representative, as

well as Medical Expert Dr. Fechner and Vocational Expert Fass-Karlin, appeared and testified at

the hearing.  (Tr. 364-388.)  In a decision dated February 28, 2008, the ALJ found that Plaintiff

was not disabled and was thus not entitled to benefits.  (Tr. 13-25.)  The decision of the ALJ

became the final decision of the Commissioner on June 18, 2008, when the Appeals Council

denied Plaintiff's request for review.  (Tr. 8-10.)  Plaintiff brought this action on July 15, 2008,

seeking modification of the Commissioner's decision or remand to the Commissioner for

reconsideration, (Compl. ¶ 2-3.), but did not file her opening brief until February 6, 2009.[18]

## F.    The Disability Standard And The Decision Of The ALJ

### 1.    The Statutory Standard For A Finding Of Disability

A plaintiff is considered disabled under the Social Security Act if she is unable to

"engage in any substantial gainful activity by reason of any medically determinable physical or

---

[18] Plaintiff's brief was due to this Court by November 25, 2008, but was not timely filed. The Court issued an Order To Show Cause on February 3, 2009, more than two months after the due date, ordering Plaintiff to show cause why this case should not be dismissed, with responses due on February 10, 2009. Rather than respond to the Order To Show Cause, Plaintiff instead filed her brief on February 6, 2009, citing no reason for the delay.

Plaintiff is represented by the law firm of Langton & Alter, who represents claimants in a number of other Social Security cases before this Court, including Mirabal v. Commissioner of Social Security (08-1079); Joassaint v. Commissioner of Social Security (08-1606); Araujo v. Commissioner of Social Security (08-5655); Johnson v. Commissioner of Social Security (08-1124); and Grimard v. Commissioner of Social Security (08-6401). Langton & Alter has repeatedly failed to file timely briefs in these matters. Indeed, briefs have been filed in these cases only at the prodding of the Court. This Order shall serve as notice to Langton & Alter that the Court will, by separate Order, convene a hearing as to why sanctions should not be imposed for failure to comply with the filing deadlines of Local Civil Rule 9.1(a). Because of this firm's habitual filing of extremely late briefs, the Court orders Mssrs. Langton and Alter to inform all new clients prior to retention that, if the firm's briefs are filed late, sanctions may include dismissal of the plaintiff's case.

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  A plaintiff will be deemed to be disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a plaintiff meets this definition of disability, the Commissioner applies the following five-step sequential analysis prescribed by Social Security regulations, 20 C.F.R. § 404.1520(a):[19]

Step One: Substantial Gainful Activity.  The Commissioner first considers whether the plaintiff is presently employed, and whether that employment is substantial gainful activity.  If the plaintiff is currently engaged in substantial gainful activity, the plaintiff will be found not disabled without consideration of her medical condition.  20 C.F.R. § 404.1520(b).

Step Two: Severe Impairment.  If the plaintiff is not engaged in substantial gainful activity, she must then demonstrate that she suffers from a severe impairment or combination of impairments considered severe.  A "severe impairment" is one "which significantly limits [the

_____

[19] Plaintiff qualifies under this section as she is considered a "surviving divorced spouse."  20 C.F.R. § 404.1505(a).

11

plaintiff's] physical or mental capacity to perform basic work activities." If the plaintiff does not demonstrate a severe impairment, she will be found not disabled. 20 C.F.R. § 404.1520(c).

Step Three: Listed Impairment. If the plaintiff demonstrates a severe impairment, the Commissioner will then determine whether the impairment meets or equals an impairment listed on the Listing of Impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the plaintiff has such an impairment, she is found disabled. If not, the Commissioner proceeds to the fourth step. 20 C.F.R. § 404.1520(d).

Step Four: Residual Functional Capacity. At Step Four, the Commissioner determines whether, despite her impairment, the plaintiff retains the residual functional capacity ("RFC")[20] to perform her past relevant work. If so, the plaintiff is found not disabled and the inquiry proceeds no further. If not, the Commissioner proceeds to the fifth step. 20 C.F.R. § 404.1520(e)-(f).

Step Five: Other Work. Finally, if the plaintiff is unable to perform past work, the Commissioner then considers the plaintiff's RFC, age, education, and past work experience to determine if she is able to make an adjustment to other work. If she cannot do so, the plaintiff will be found disabled. 20 C.F.R. § 404.1520(g).

This five-step analysis to determine whether a plaintiff is disabled involves shifting burdens of proof. Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1153 (3rd Cir. 1983). The plaintiff bears the burden of persuasion through the first four steps. Bowen v.

---

[20] RFC designates the plaintiff's ability to work on a sustained basis despite her physical or mental limitations. The RFC determination is not a decision as to whether a plaintiff is disabled, but is used as the basis for determining the particular types of work a plaintiff may be able to perform despite her impairment(s). See 20 C.F.R. § 404.1545.

12

Yuckert, 482 U.S. 137, 146 n.5 (1987).  If the analysis reaches the fifth step, however, the

Commissioner bears the burden of proving that the plaintiff is able to perform other work

available in the national economy.  Id.

      2.      The ALJ's Decision

      At Step One, the ALJ determined that Plaintiff had not performed substantial gainful

activity since the alleged onset of her disability on September 19, 2004, through her date last

insured of December 31, 2006.  20 C.F.R. §§ 404.1520(b), 404.1571 *et seq*., (Finding 2, Tr. 19.)

At Step Two, the ALJ determined that the medical evidence on record established that Plaintiff

had the following severe impairments: status-post myocardial infarction, coronary artery disease,

Grave's disease, and depression.  20 C.F.R. § 404.1520(c), (Finding 3, Tr. 19.)  These

impairments caused Plaintiff significant functional limitations.  (Tr. 19.)  At Step Three, the ALJ

determined that Plaintiff's impairments did not meet or medically equal one of the listed

impairments in 20 C.F.R. 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d), (Finding 4, Tr.

19.)  At Step Four, the ALJ determined that Plaintiff had the RFC to perform light work.[21]  20

C.F.R. § 404.1520(d), (Finding 5, Tr. 20-21.)  Therefore, the ALJ concluded that Plaintiff was

unable to perform her past relevant work as an administrative aide, because the Vocational

Expert testified that it was skilled in nature and exceeded her RFC.  20 C.F.R. § 404.1565,

(Finding 6, Tr. 23-24, 383-384.)  However, the ALJ also found that, considering Plaintiff's age,[22]

---

[21] *Supra,* note 16 at 8-9.

[22] Since Plaintiff was 44-years old on the date last insured, she was considered to be a "younger
individual" (under age 50), as defined under the Regulations.  20 C.F.R. § 404.1563.

education,[23] work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed.  20 C.F.R. §§ 404.1560(c), 404.1566, (Finding 10, Tr. 24.)  Based on these findings, the ALJ concluded that Plaintiff was not disabled, as defined by the Social Security Act.  20 C.F.R. § 404.1520(g).[24]

## II. DISCUSSION

### A.    Standard of Review

This Court reviews the decision of the Commissioner to determine whether there is substantial evidence in the administrative record supporting his decision.  42 U.S.C. § 405(g); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  If there is substantial evidence supporting the Commissioner's finding, this Court must uphold the decision even if it might have reasonably made a different finding based on the record.  Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

### B.    Review Of The Commissioner's Decision

Plaintiff challenges the decision of the Commissioner on grounds that the ALJ's denial of benefits is not supported by substantial evidence.  (Pl. Br. 13.)  Specifically, she argues that the ALJ erred by: (1) ignoring the Appeals Council Order (that remanded the ALJ's first decision)

---

[23] The ALJ found that Plaintiff has at least a high school education and is able to communicate in English.  20 C.F.R. § 404.1564.

[24] The ALJ found that transferability of job skills was immaterial to the determination of disability because using the Medical-Vocational Rules as a framework, supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills.  See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2.

and using a non-examining or treating doctor's opinion to overrule the treating physician's opinion, (Pl. Br. 14); (2) overruling the opinion of Plaintiff's treating psychiatric therapist and using her own opinion of Plaintiff's lifestyle in order to determine Plaintiff's RFC, (Pl. Br. 19); and (3) using a hypothetical that did not reasonably convey the extent of Plaintiff's mental limitations, and thus the Vocational Expert's answer to the hypothetical cannot be deemed substantial evidence to support the ALJ's decision.  (Pl. Br. 26.)  The Court will consider each argument in turn.

      1.    <u>Doctors' Opinions</u>

The ALJ's determination at Step Four that Plaintiff is capable of an RFC for light work (Finding 5, Tr. 20) is well supported by the record.  Plaintiff argues this was an error because: (1) the ALJ's determination of the RFC for light work was made without an explanation and without clarification from medical sources; (2) the ALJ ignored the Appeals Council recommendations to obtain clarification from treating physicians; and (3) the ALJ overruled Plaintiff's treating cardiologist, Dr. Cohen's opinion with the opinion of Dr. Fechner, a Social Security consultant. (Pl. Br. 14-17.)

The ALJ followed a two-step process when considering Plaintiff's symptoms by: (1) determining whether there was an underlying medically determinable physical or mental impairment(s) and (2) evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit Plaintiff's ability to do basic work activities.  (Tr. 21.)  When statements about the intensity, persistence, and limiting effects were not substantiated by objective medical evidence, the ALJ also made a finding on the credibility of the statements based on a consideration of the entire case record.  (Tr. 21, 20 C.F.R.§ 404.1529).

First, Plaintiff argues that the ALJ did not provide an explanation or clarification from medical sources for his RFC determination.  (Pl. Br. 16.)  To the contrary, the ALJ clearly stated that, "after considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 22.)  Furthermore, the ALJ properly relied on medical sources to reach this determination.  The ALJ noted that Plaintiff sustained a myocardial infarction in September 2004, but that Plaintiff's treating cardiologist, Dr. Cohen, reported that she was angina free in March 2005 and that she had no typical anginal chest pain in a follow-up examination in November 2007.  (Tr. 22, 188, 306.)  The ALJ also noted that Plaintiff's Grave's disease was successfully treated with radioiodine therapy; even though she developed hypothyroidism post-treatment, this stabilized with the medication Synthroid and her thyroid blood levels had also normalized.  (Tr. 22, 308-317.)  Furthermore, the ALJ considered Dr. Cohen's assessment that Plaintiff was disabled from "full function" in May 2005 (Tr. 23, 190), but also noted that the doctor did not "provide a functional assessment nor did he assess that the claimant was disabled from all work activity," and noted that Dr. Lathan, (a consultative examiner), stated that Plaintiff had "'severe' restriction for activities requiring strenuous exertion."  (Tr. 23.)  The ALJ used these medical records and doctors' statements to conclude that Plaintiff could not perform "strenuous activity required in medium and heavy work" but that she was able to "perform work at the light exertional level." (Tr. 23.)  Therefore, the ALJ

16

properly explained his reasoning and used medical sources to reach his determination.[25]

Second, Plaintiff argues that the ALJ ignored the Appeals Council's recommendation to obtain clarification from treating physicians. (Pl. Br. 16.)  However, according to the Appeals Council's opinion, the ALJ had to "give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations" (SSR 96-8p), with the option to request additional evidence from a treating or examining source in order to obtain clarification for an opinion, "as appropriate," or in other words, at the ALJ's discretion.  20 C.F.R. § 404.1512.  Here, the ALJ's RFC determination was properly supported by the medical reports; therefore, the ALJ did not need to obtain supplemental information from the treating physicians in order to obtain clarification.  The record contained all of Dr. Cohen's medical reports, which illustrated the fact that Plaintiff consistently did not experience chest pain, angina, or shortness of breath (Tr. 188, 191, 200, 223, 225, 227, 235, 237), with rare exceptions,[26] and that she exercised.  (Tr. 188, 193, 225, 235.)  In making this RFC determination, the ALJ also newly noted that Dr. Cohen again reported that Plaintiff had no typical anginal chest pain during her follow-up examination in November 2007, and that Plaintiff's Grave's disease was successfully

---

[25] Further evidence from the record supplements the ALJ's determination.  Social Security consultant Dr. Fechner testified that Plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently, and walking or standing for six hours within an eight-hour work day.  (Tr. 382.) Furthermore, Dr. Wells, another Social Security consultant, found that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk with normal breaks) for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight hour workday, and had the unlimited ability to push and/or pull.  (Tr. 206.)

[26] On only three occasions, over the span of four years of doctor's visits, did Plaintiff complain of chest pain or shortness of breath: on January 26, 2005, Plaintiff complained of atypical chest pain and palpitations (Tr. 195); on February 16, 2005, Plaintiff complained of palpitations (Tr. 193); and on November 12, 2007, Plaintiff complained of shortness of breath on exertion.  (Tr. 306.)

17

treated, her hypothyroidism had stabilized with medication, and her thyroid blood levels had

normalized.  (Tr. 22.)  Furthermore, Dr. Cohen's 2005 statement that Plaintiff was disabled from

"full function" does not conflict with the ALJ's RFC determination that Plaintiff was capable of

light work.  (D. Br. 19).  Therefore, there was no need for the ALJ to contact Dr. Cohen for

clarification regarding his statement.

Finally, Plaintiff argues that the ALJ overruled Dr. Cohen's opinion (her treating

physician) with that of Dr. Fechner's opinion (a Social Security consultant).  (Pl. Br. 17.)

However, the ALJ properly considered Dr. Cohen's opinion along with the rest of the medical

evidence, as required by the Social Security regulations.  20 C.F.R. § 404.1527(b).  As noted

above, the ALJ observed that Plaintiff sustained a myocardial infarction in September 2004, but

that Dr. Cohen reported that she was angina free in March 2005 and that she had no typical

anginal chest pain in November 2007.  (Tr. 22, 188, 306.)  The ALJ also noted that Plaintiff's

Grave's disease was successfully treated with radioiodine therapy and that her hypothyroidism

had stabilized with the medication Synthroid and her thyroid blood levels had normalized.  (Tr.

22, 308-317.)  Furthermore, the ALJ considered Plaintiff's limitations, such as the fact that Dr.

Cohen assessed that Plaintiff was disabled from "full function" in May 2005 (Tr. 23, 190), and

that Dr. Lathan, a consultative examiner, stated that Plaintiff had "'severe' restriction for

activities requiring strenuous exertion."  (Tr. 23.)  Therefore, instead of disregarding the treating

physician's opinion in order to honor the consultative doctor's opinion, the ALJ used the

aggregate and consistent medical records to conclude that Plaintiff could not perform "strenuous

activity required in medium and heavy work" but that she was able to "perform work at the light

exertional level."  (Tr. 23.)

18

2.     Psychiatrist's Opinion

Next, the ALJ's determination of Plaintiff's mental RFC at Step Four is also properly

supported by the record.  (Finding 5, Tr. 20.)  Plaintiff argues this is an error because the ALJ

overruled Plaintiff's treating psychiatrist's opinion and instead used her own personal opinion of

Plaintiff's lifestyle when determining Plaintiff's RFC.  (Pl. Br. 19.)

As stated above, the ALJ followed a two-step process when considering Plaintiff's

symptoms by: (1) determining whether there was an underlying medically determinable physical

or mental impairment(s) and (2) evaluating the intensity, persistence, and limiting effects of

Plaintiff's symptoms to determine the extent to which they limit Plaintiff's ability to do basic

work activities.  (Tr. 21.)  When statements about the intensity, persistence, and limiting effects

were not substantiated by objective medical evidence, the ALJ also made a finding on the

credibility of the statements based on a consideration of the entire case record.  (Tr. 21, 20 C.F.R.

§ 404.1529).

Plaintiff argues that the ALJ overruled the psychiatric opinion of her treating therapist,

Nurse Specialist Kobberger, which the Appeals Council mandated her to consider.  (Pl. Br. 20-

21.)  On the contrary, the ALJ considered Nurse Specialist Kobberger's opinion along with the

other medical evidence, to determine that Plaintiff had limitations in her mental RFC, but that

she was still able to perform some types of work.  (D. Br. 20.)  The Appeals Council Order

requested that the ALJ review Nurse Specialist Kobberger's mental impairment questionnaire in

its entirety, because, "although Ms. Kobberger's assessment appears somewhat inconsistent," the

ALJ's first decision did not consider her "poor" or "none" assessments of Plaintiff's "ability to

maintain regular attendance and be punctual within customary, usually strict tolerances; deal with

19

work stresses; and to perform at a consistent pace without an unreasonable number and length of

rest periods." (Tr. 275.) The Appeals Council Order also said that the ALJ's first evaluation of

Plaintiff's mental impairment "lacks clarity."[27] In her second opinion, the ALJ included Nurse

Specialist Kobberger's updated summary of therapy sessions in 2007, which showed that

Plaintiff continued "to experience fluctuating degrees of anxiety and depression...still the

therapist opined that she had global assessment of functioning (GAF) 65-75, fluctuating range of

70...which is consistent with 'mild' psychological symptoms." (Tr. 22.) Furthermore, the ALJ

acknowledged that Plaintiff's therapist found that Plaintiff had "poor or no ability to maintain

regular attendance and be punctual within customary work tolerances...poor or no ability to

perform at a consistent pace without reasonable number of and length of rest periods." (Tr. 22-

23.) At the same time, the ALJ noted that Nurse Specialist Kobberger stated in 2006 that

Plaintiff's "general stress level improved and that depression was in partial remission with only

mild symptoms," and that she also opined that Plaintiff has "good ability to understand,

remember and carry out detailed instruction; a very good ability to interact with others; and a fair

ability to deal with stress." (Tr. 22.) Therefore, the ALJ took into consideration the fact that

Nurse Specialist Kobberger's opinions vacillated in regards to Plaintiff's abilities. Furthermore,

the ALJ properly considered these reports and compared them with Plaintiff's testimony at the

hearings. As the ALJ noted, Plaintiff "testified to a very detailed schedule that she keeps each

---

[27] Specifically, the Appeals Council Order said that the ALJ found that Plaintiff's depression was
a "severe impairment," although she found that Plaintiff's daily living, social functioning, concentration,
persistence, and pace were all "mildly limited," and that there was no evidence of Plaintiff having
"episodes of decompensation for extended periods." (Tr. 275.) Furthermore, the Appeals Council noted
that the ALJ did not assess any actual limitations in Plaintiff's mental functioning. (Tr. 275.)

day regarding caring for her children."[28]  (Tr. 23.)  Based on this detailed schedule, as well as

Plaintiff's response that she wants her children "to have the best things that they can have" to the

ALJ's question of if she thought their schedule was too demanding (Tr. 23, 378), the ALJ made

the determination that Plaintiff is able to keep a schedule if she wants to, and that she has the

ability to concentrate and focus.  (Tr. 23.)  By finding that Plaintiff was capable of light work, but

limiting it to simple, unskilled, low stress work that allows three breaks per day (Tr. 16), the ALJ

showed that she took into consideration Plaintiff's therapist's different opinions regarding

Plaintiff's abilities as well as Plaintiff's testimony about her own abilities.

      3.    <u>ALJ's Hypothetical</u>

The ALJ's hypothetical posed to the Vocational Expert (in order to make a determination

at Step Five of the required analysis), was based on substantial evidence in the record.  (Finding

10, Tr. 24.)  Plaintiff argues that the ALJ failed to pose a hypothetical that accurately conveyed

Plaintiff's mental limitations, and therefore, the Vocational Expert's response to the hypothetical

is argued insufficient evidence to support the ALJ's denial of benefits at Step Five.  (Pl. Br. 26.)

As noted above, at Step Five of the analysis, the burden shifts to the Commissioner to

prove that the plaintiff is able to perform other work available in the national economy.  <u>Bowen</u>

---

[28] Specifically, the ALJ noted that Plaintiff testified to the following detailed schedule: "...at 6:00 a.m. she awakens her children and they read for one half-hour; at 7:00 a.m, the claimant testified that she gets her children's clothes out and prepares then [sic] breakfast; at 8:30 a.m., she takes her sons to two different schools and then drops her daughter off at her pre-school; at 9:00 a.m., the claimant exercises at the YMCA; at 9:45, she returns home to clean up the kitchen and take a shower; at 11:30 a.m. she picks up her daughter from pre-school; they return home for lunch.  She then amuses her daughter and they may nap.  At 2:30 p.m. she testified that she makes dinner; at 3:00 p.m. the claimant testified that she picks up her sons from school; at 3:20 the children eat; at 3:30 p.m. she takes her children to religious instruction; at 4:00 p.m. the children attend karate classes; at 5:45 p.m. she takes them to swimming lesions [sic].  The claimant further advised that her children are involved in baseball and soccer during the appropriate sessions."  (Tr. 23.)

v. Yuckert, 482 U.S. at 146 n.5 (1987).[29]  While making this determination, the ALJ considered Plaintiff's RFC, age, education, and work experience, as well as the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  (Tr. 24.)  If Plaintiff had the RFC to perform the full range of light work through the date last insured, Medical-Vocational Rule 202.21 would dictate a finding of "not disabled."[30]  (Tr. 24.)

The ALJ found that Plaintiff's ability to perform a full range of light work was "impeded by additional limitations;" (Tr. 24), the ALJ found that Plaintiff retained the RFC to perform simple, unskilled, and low stress work, with only occasional contact with supervisors, co-workers, and the public, and which allowed three breaks during the workday.  (Tr. 20-21.)  Because the ALJ found that Plaintiff was unable to perform a full range of light work, the ALJ sought testimony from a Vocational Expert.  (Tr. 24.)  The ALJ asked the Vocational Expert if there were jobs in the national economy for an individual with Plaintiff's age, education, work experience, and RFC.  (Tr. 24.)  The ALJ created a hypothetical that mirrored Plaintiff's RFC.[31] (Tr. 16.)  The ALJ took into account the fact that Plaintiff was able to do "light work," but couched it with certain limitations on the stress and skill levels, and allowing for breaks.  In so doing, the ALJ showed consideration of limitations in Plaintiff's mental RFC, as demonstrated

---

[29] As previously noted, the ALJ found that Plaintiff was unable to perform her past relevant work as an administrative aide, since the Vocational Expert testified that such work was skilled in nature, and therefore it exceeded her RFC.  (Tr. 23-24.)

[30] According to Medical-Vocational Rule 202.21, if Plaintiff's maximum sustained work capability is limited to light work as a result of a medically severe impairment, and Plaintiff is a younger individual (age 18-49), is a high school graduate or more, and her previous work experience consisted of non-transferable skilled or semi-skilled skills, then she is found not disabled.  20 C.F.R. Part 404, Subpart P, Appendix 2.

[31] *Supra*, note 16 at 8-9.

by Plaintiff's therapist.  (Tr. 22-23.)

In response to the ALJ's second hypothetical, (which included the same characteristics of the first, but also "that because of fatigue and anxiety that is experienced during the day, and also depression, the effects of depression, that this person that I've described would only be able to focus for about one-third of the workday," (Tr. 385), the Vocational Expert stated that said individual would be incapable of working.  Plaintiff argues that this colloquy shows that Plaintiff is unable to work.  (Pl. Br. 26.)  However, while the Vocational Expert found such a hypothetical individual to be incapable of working, (Tr. 385), the ALJ's determination that Plaintiff was able to focus and concentrate, was based on the medical record and her own testimony, and therefore this hypothetical individual does not match the Plaintiff.  (Tr. 23.)  As the ALJ stated in her opinion, Plaintiff's detailed schedule, as illustrated in her testimony, "shows that at the very least she has a basic ability to concentrate, focus, etc."  (Tr. 23.)  Therefore, the ALJ properly relied in part on Plaintiff's testimony in order to determine her RFC.  In this way, the ALJ properly developed accurate hypotheticals, made fact-finding supported by substantial evidence in the record, and made a reasoned decision about the Vocational Expert's hypothetical questions and answers, which she relied upon in her determination that Plaintiff was not disabled, at Step Five.

## III. CONCLUSION

For the reasons set forth above, and after careful review of the record in its entirety, the Court finds that the ALJ's conclusion that Plaintiff is not disabled is based on substantial evidence in the record.  Accordingly, this Court will **AFFIRM** the Commissioner's decision to deny Plaintiff Social Security benefits.

Therefore, **IT IS** on this 23rd day of July 2009, hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED;** and it is further

**ORDERED** that this case is **CLOSED.**

<u>**/s/ Faith S. Hochberg**</u>
Hon. Faith S. Hochberg, U.S.D.J.

24